[No. 35888. Department Two. July 5, 1962.]

CHARLES STE. MARIE et al., Appellants, v. WILLIAM J. COMMAND et al., Respondents.*

*Comfort, Dolack & Hansler*, for appellants.

*Karr, Tuttle, Campbell, Koch & Granberg* and *F. Lee Campbell*, for respondents.

DONWORTH, J.—This is an appeal from a judgment of dismissal entered upon a jury verdict in favor of respondents in an action to recover damages for personal injuries sustained by appellant wife while shopping in respondents' grocery store.

The appeal is before us on a short record. In their concise statement, appellants rely on the following points:

*Reported in 373 P. (2d) 121.

1. The refusal of the trial court to give a requested instruction that appellant wife was an invitee or business invitee of respondents at the time of the accident.

2. Its refusal to give a certain requested instruction regarding appellant wife's alleged contributory negligence.

3. The trial court's error in denying appellants' motion for a new trial based on its refusal to give the two requested instructions referred to above.

Appellants (husband and wife) drove to respondents' grocery store about 8:00 p.m. November 13, 1959, for the purpose of purchasing some beer. The husband remained in the car while the wife went into the store to purchase the beer.

Upon entering the store, she went to the walk-in cooler, where she picked up a six-pack of beer. In leaving the cooler, she fell on the floor and sustained a broken ankle.

The evidence was in dispute regarding the cause of her fall. The focal issue concerns a wooden mat made of half-inch slats which, the wife testified, was on the floor immediately in front of the entrance to the cooler.

She testified about her entry and exit from the cooler as follows:

"After I entered the store, I walked immediately to the walk-in cooler at the rear of the store to get the six-pack of beer. I walked between the end of the meat counter and the walk-in cooler, stepped to the door of the walk-in cooler, opened it, and entered. I took, I believe, two steps into the cooler. The beer was to the right as I entered. I distinctly remember stepping on the wooden mat, immediately outside of the door of the cooler, before entering the cooler.

"After I had picked up the six-pack of beer, in the cooler, I put it under my left arm. I turned around, and walked out the cooler door, going frontwards, and not backwards. The cooler door had not been shut tight when I entered. I would have had to pull the door hard to pull it all the way shut. It was closed, but not latched.

"When I stepped down from the walk-in cooler to the floor, my right foot was the first to touch down. I stepped it onto the wooden mat. Then I stepped my left foot down from the cooler and had both feet on the wooden mat. When I pivoted on my left foot to turn to close the door, it seemed that there was nothing under my left heel and I fell

down. As I turned, I knew that I was going to fall and tried to catch myself. I just lost my balance on that wooden mat.

"(The witness gave a demonstration of how the accident occurred).

"I had on black and white saddle shoes with one-half inch heels that night.

"After I fell, my left leg was lying on the mat. I had tried to break my fall with my right hand. I do not believe I hit anything with any part of my body, as I fell. (The witness was shown exhibits 2 to 6, inclusive, and particularly the position of the mat on plaintiff's Exhibit 6.)

"The mat itself looked like it does in the pictures, but it was not in that position on the night of the accident. The long axis of the mat was at right angles to the door, just below the doorway to the cooler, and just about in the middle of the door. (Indicating, on Plaintiff's Exhibit 1, the said position by a rectangle in lead pencil)."

No other person witnessed the accident. However, the wife called to Lynn Woods, a seventeen-year-old stock boy employed by respondents, who went to her assistance. His testimony differed in several material respects from that of appellant wife. He testified, in part:

"I was in the store when Mrs. June Dolores Ste. Marie fell down. I was at the produce stand, at the rear of the store, at the time. I heard Mrs. Ste. Marie call, and I went to her. When I first saw her she was sitting up, propped on her arm. There was a six-pack of beer lying near her. She was behind the meat counter (indicating, on Plaintiffs' Exhibit 1, where she was sitting, with a circle in dark-blue pencil).

"The pallet board was right here when I first saw her (indicating on Plaintiffs' Exhibit 1, by a rectangle in dark blue pencil, lined, that the wood mat was between the end of the meat counter and the walk-in cooler). I stepped over the pallet board when I went to get Mrs. Ste. Marie.

"No part of her body was touching the pallet board when I saw her. The Board was about 3 feet from her. I had been instructed by Mr. Command as to the proper placement of the mat and it was in its proper place, between the end of the meat counter and the walk-in cooler, when I saw Mrs. Ste. Marie. It was not below the door of the cooler.

"When I reached Mrs. Ste. Marie she told me that she was backing out of the cooler and that her foot did not quite go all the way on the step and she fell backwards to

the floor. She said nothing about having tripped or fallen over the pallet board. I couldn't get Mrs. Ste. Marie up, so I got Mr. Command. Then I went and got her husband. There was no one else around when Mrs. Ste. Marie told me how she fell."

The deposition of respondent husband was taken by appellants' counsel and read at the trial. A large part of it related to the location and condition of the wooden mat. It is too long to quote at length, but the following excerpt is particularly pertinent:

"Q. What did you have on the floor of the store in front of the cooler, did you have any special device there? A. I had what they call a sawdust mat, not in front. I could say possibly it shouldn't have been in front of the cooler, it should have been to one side of the cooler. The mat is used primarily for wiping the sawdust off your feet. However, if the mat—I don't know whether the mat was in front of the cooler when she walked out. It should have been placed approximately 18 inches from the entrance of the door so— Q. I see. How was the mat usually placed, was the long axis usually at right angles to the door? A. Yes. Q. Was it for the use of the public in getting the sawdust off their feet? A. Yes. Q. What was this mat made of? A. Oh, slats, lumber. Q. I see. A. I would say half-inch slats. Q. Do you recall where the mat was that night when you saw it? A. No. Q. When Mrs. Ste. Marie was present? A. I don't recall. Q. Do you recall whether any part of Mrs. Ste. Marie's body or clothing was touching the mat? A. No, I don't recall. . . . Q. Does your hired help have any instructions with reference to the placement of this mat, Mr. Command? A. Yes. Q. What are those instructions? A. When the sawdust is raked and cleaned, then the floor is swept, the mat is to be placed like I explained. Q. I see. Have you ever noticed it in front of the cooler at any time? A. Yes, I have. Q. And what have you done when you have? A. I immediately take it and put it in its place. Q. Did you notice the mat in such condition at any time that day? A. No. Q. Looking at this mat, would you agree that it appears that there are two slats or cross-pieces off of the mat, two full ones? A. Yes. Not full ones, partial ones. Partly. Q. On one side there appears to be at least one full cross-piece out, isn't that correct? A. I guess so, yes. I never noticed that. Yes. Q. And is that one or two cross-pieces out, would you say? A. I would say one full one,

one half, and one quarter one out. Q. I see. Did it ever occur to you, Mr. Command, that a mat in this condition might be a hazard to people walking upon it? A. I never thought of it that way."

Respondent wife was called as an adverse witness and testified briefly. Upon examination by her counsel, she said that the wooden mat was kept, and was supposed to be kept, between the meat counter and the walk-in cooler to keep the sawdust from being tracked into the store proper from behind the meat counter.

As previously stated, the jury resolved the conflicting evidence in favor of respondents either on the issue of respondents' alleged negligence or (if such negligence were found) on the issue of appellant wife's contributory negligence as being a proximate cause of the accident.

We first consider point No. 1 concerning appellants' statement in their brief:

"The error of the court in failing to peremptorily instruct that Mrs. Ste. Marie was a 'business invitee' was not, it is conceded, so likely to mislead the jury by non-instruction, as to warrant reversal of the judgment. Were that the only error, this appeal would not have been taken. But the refusal to give the requested contributory negligence instruction is another matter. This was critical, reversible error."

While it possibly would not have been error if the court had given the requested instruction that appellant wife was a business invitee at the time in question (since respondents at the trial did not dispute her status), we do not think that the failure to so instruct the jury constituted prejudicial error. In instruction No. 11, the term "business invitee" was correctly defined.

The second point relied upon by appellants is the refusal of the trial court to give the following requested instruction:

" 'You are instructed that in considering and determining whether or not the plaintiff was guilty of contributory negligence that it is not contributory negligence to fail to look for danger unless there is some reason to apprehend danger.

" 'While one must use his faculties and senses to discover

and avoid danger, yet, where there is no reason to anticipate danger or hazard, reasonable care does not require one who was walking in a place provided for that purpose to keep his eyes riveted to the floor immediately in front of his feet. So in this case, if you find from the evidence that the plaintiff did not see any dangerous object or material on the floor before coming in contact with it, and if you further find from the evidence that in the exercise of reasonable care on her part under all the surrounding facts and circumstances the plaintiff would not have discovered the presence of such object before coming in contact with it, then the plaintiff would not be guilty of contributory negligence.' "

Respondents, in their answer, affirmatively pleaded that appellant wife was contributorily negligent in three respects, in that she:

"1. Walked in such a manner as was unreasonable under the circumstances then and there existing, resulting in said fall;

"2. Failed to exercise that degree of care and caution which a reasonable person would have exercised under similar circumstances;

"3. Failed to keep a proper lookout as she attempted to leave the storage locker referred to in her complaint."

The proposed instruction would have adequately instructed the jury on the law relating to the third allegation of negligence. However, the last sentence of the proposed instruction would have told the jury that, if appellant wife was not contributorily negligent in failing to keep a proper lookout, she was not contributorily negligent at all. Furthermore, the proposed instruction could have been construed to mean that, under the evidence presented, the only way that appellant wife could be found to have walked unreasonably, or to have failed to exercise reasonable care, would be to find that she had negligently failed to keep a proper lookout. The latter would have amounted to a comment on the evidence, since there was evidence that appellant wife had backed out of the walk-in cooler, which, if believed by the jury, could have supported a finding of contributory negligence.

Since there were allegations of contributory negligence, which were supported by evidence, other than the allegation covered by the instruction which was proposed and rejected, and since the proposed instruction purported to cover the entire issue of contributory negligence, it was an incorrect statement of the applicable law and the trial court would have committed error in giving it.

We agree with appellants' contention that they were entitled to have the jury instructed on their theory of the case. In instruction No. 7, the terms "negligence," "contributory negligence," and "proximate cause" were . defined correctly. Instruction No. 12 informed the jury of the duty owed by a storekeeper to his patrons:

"A storekeeper owes to its business invitees a duty to use ordinary care to make the floor of the store reasonably safe for their use, that is, to maintain the floor in such a condition as a reasonably careful and prudent storekeeper would deem sufficient to protect them from danger while exercising ordinary care for their own safety."

We think that the instructions as given to the jury, when read as a whole, fairly submitted the issue of contributory negligence to them.

In *State v. Wilson*, 26 Wn. (2d) 468, 482, 174 P. (2d) 553 (1946), the late Judge Steinert, speaking for the court, pointed out that:

"It is the rule in this state that it is not error to refuse to give a requested instruction unless it is substantially correct and such as the court might give to the jury without modification or omission, since no duty rests upon the court, in the midst of a trial, to pause and of its own motion correct a requested instruction and then give it as corrected. *Nollmeyer v. Tacoma R. & Power Co.*, 95 Wash. 595, 164 Pac. 229; *State v. Woods*, 163 Wash. 224, 1 P. (2d) 219. . . ."

There was no error in refusing to give the requested instruction.

We conclude that none of the points on which appellants rely in their concise statement for reversal has merit, and,

therefore, the trial court's judgment of dismissal must be, and hereby is, affirmed.

FINLEY, C. J., WEAVER, ROSELLINI, and OTT, JJ., concur.